Our final case for the day is Worku v. Lynch, Mr. Zubo. Zubo, Your Honor. Zubo. There's a lot of difficult names to pronounce in this case, Your Honor. May it please the Court. I appreciate your help. Thank you. May it please the Court, Your Honors. My name is Jason Zubo. I represent the petitioner, Shewangizaw Worku. Your Honors, this is a petition for review from a decision by the Board of Immigration Appeals. The question presented here is whether the agency's credibility determination was supported by substantial evidence. It was not. The immigration judge and the BIA erred as a matter of law when they dismissed the testimony of four live witnesses based on the legal standard that applies only to absent witnesses. The Real ID Act requires that witness testimony be evaluated based on the totality of the circumstances. That's 8 U.S.C. 1158 B1, B3. That lists the factors that an immigration judge should consider when making a credibility  Demeanor, candor, responsiveness, consistency, plausibility. The immigration judge did not consider any of those factors. In fact, she found that the witnesses testified and that there were no inconsistencies or specific areas of credibility concerned with these witnesses. Instead, she dismissed the testimony of the four witnesses, not based on the Real ID Act factors, but instead based on the fact that they were friends or family members of Mr. Worku, the petitioner in this case. Isn't there some precedent for that? The IJA relied on a case called Gonziami-Miku, which is a case that says essentially witness letters are not the type of independent evidence contemplated by this court's case in Kamara v. Ashcroft. In Gonziami, there were letters that were submitted, but the witnesses were not available for cross-examination. And that's significant in light of particularly the BIA case, which I mentioned in the 28-day letter I submitted, Your Honors. The BIA and HOH and ZYZ essentially looked at Gonziami-Miku and noted that that case did not, there were witnesses who were not available for cross-examination, and that was significant. In our case, the witnesses were available for cross-examination. And really, you can't imagine another situation in a court of law where due process is in effect, where witnesses can be, their testimony can be dismissed not on the basis of what they've said or on cross-examination, but instead solely because they're friends or family members of the petitioner. This legal error by the immigration judge in terms of evaluating the witness testimony taints the entire credibility determination of the IJA. Under the Real ID Act, she was required to consider the totality of the circumstances in reaching her credibility determination. Most of the credibility issues that she raised in terms of the petitioner, Mr. Warku, were issues that on close inspection, either there are discrepancies that don't exist. What she did was compare asylum officer notes, which was the testimony that Mr. Warku gave at the asylum office, with the more detailed testimony he gave in court. And if you look at the notes and actually look at what Mr. Warku said, it doesn't support what the immigration judge claims that he said in reaching her own credibility determination. I think, Your Honors, the Kamara case is particularly instructive here. In Kamara, Ms. Kamara, the asylum applicant, lied about a couple important things. She lied about whether she had had a previous pregnancy. Part of her case was, well, I was detained by my government, and during the detention, I was harmed, and as a result, I miscarried. So she said, well, as a result of that miscarriage, I was spurred to further political action. Turns out that she actually had two prior children, and that the miscarriage actually occurred shortly before she left the country. So she said, well, this marriage was particularly traumatic for me, this miscarriage, excuse me, was particularly traumatic for me, because this was the first time I was ever pregnant. That was a lie. This court found that the IJ's decision in that case was supported by substantial evidence. However, there was independent evidence that supported Ms. Kamara's, the asylum applicant's, claim that she had suffered past persecution. The independent evidence, in our case, is actually stronger. In Kamara's case- What's independent evidence? You're saying additional evidence. What does independent mean? Does it mean objectively independent, and do you still have a problem when you have relatives or not? I think that there's maybe a little bit of glossing over what's independent evidence, and that's what I'm concerned with. How do we narrow that? Yes, Your Honor. It seems that independent evidence, the actual term itself is not defined, but Kamara does list some evidence that he considers independent evidence. It lists the State Department Country Report, which clearly is independent. We have that in our case. It lists a membership card in Ms. Kamara's political party. We also have a membership letter from Mr. Workum's case. It lists a warrant for arrest and a notice of escape, it was called, in Ms. Kamara's case. Both of those documents, the immigration judge found to be suspicious, but the immigration judge hadn't specifically dismissed those pieces of evidence. In our case, we have actually substantially more evidence that's independent. Not only do we have the party letter and we have the State Department corroboration in terms of the political situation at the time, but we have a dermatology report that says the dermatologist examined Mr. Workum's injuries and determined they were consistent with his affidavit. We have a mental status evaluation. Under this court's actually recent decision, Olonga v. Holder, 777F3R199, the court found that failure to consider PTSD, which a mental status evaluation indicates Mr. Workum was suffering, failure to consider PTSD in reaching a credibility determination is grounds for reversal of that credibility determination. We also have a piece of evidence which I think is particularly significant and the judge ignored in our case. We have from Addis Ababa University, which is Mr. Workum's university, we have his university transcript and student ID card indicating that he was a student in April 2001. We also have the State Department report at AR-818 and a Human Rights Watch report that both indicate that political protests were taking place at the exact same time Mr. Workum was present at the university. So taken together, we know that he was at the university and from the State Department and Human Rights Watch, we know that thousands of people, thousands of students were arrested from the university at the exact same time. And then in addition, and this I think goes to your question, Judge Keenan, we have four witnesses and the question is, are these four witnesses independent? It's clear from Kamara that the four witness letters without the witnesses being present are not independent evidence because that's what Gonziami recognizes. Well, the independence though, doesn't that go to any potential bias? That could be argued, Your Honor, but I would say that under the Real ID Act, again, 8 U.S.C. 1158, Congress has scored the factors that should be considered when evaluating not just the asylum applicants' credibility but also the witnesses' credibility and the judge didn't do that. So perhaps the bias that they may have is something that could have been explored on cross-examination. They could have been asked about it. They were not. Right. I understand that, but I just don't know the extent to which we assess that as independent evidence or not, simply because their credibility wasn't attacked on cross-examination doesn't make them independent. It may have made them a stronger witness, but I don't know that we would fairly characterize that as independent. Well, they're independent in that they can speak for themselves. Just like a document, like a State Department report speaks for itself. They're independent in the sense that they have provided detailed testimony. In this case, it's particularly detailed in terms of the affidavit that could have been used for cross-examination purposes, but the government attorney and the immigration judge chose not to cross-examine them on their affidavits or on their stories. Right. But in the Gandhi-Zami case, we said the affidavits from family members were not independent. So I guess my question is, if they show up for live testimony, how does that make them any more independent? It makes them more subject to cross-examination and, therefore, their credibility more reasonably available to being tested, but how does that make them more independent within the purposes of our holding in that earlier case, Gandhi-Zami? My impression of Gandhi-Zami, Your Honor, is that the letter itself, because the witness cannot be subject to cross-examination, it's not considered independent evidence. It's not something that's independently verifiable, whereas a live witness is independently verifiable. But, again, there's no case law on this, and obviously there's some deference due to the agency in terms of determining what is independent evidence, but our point is that the Real ID Act describes the regime that the immigration judge was required to follow when she reached a credibility determination with regard to those witnesses. She didn't follow that regime. She didn't examine them for anything, actually, except for that they were related to the applicant in this case. And that's particularly problematic because, essentially, an asylum applicant has the right under the asylum law, as indicated by Congress in this court discussed in Selgakha v. Carroll, the applicant has the right to present evidence and witnesses on his own behalf. If a witness can simply be dismissed because the witness happens to be a family member or a friend of the applicant, it essentially negates the right to present witnesses. And here I point out that one of the four witnesses was actually not a family member or a friend, so even under the immigration judge's flawed theory, that witness should have been credited in terms of his testimony. He was a neighbor of the applicant's parents, so there was no family or friend relationship. So, essentially, it puts the applicant in an impossible position. And, again, so this, the failure, the legal error of not crediting the witness testimony taints the overall credibility determination, which should be made under a totality of the circumstances. And just a couple quick points. It's difficult to nitpick from kind of this level of the Fourth Circuit, looking back at what the immigration judge did, but there are some very strong problems, some real problems with the immigration judge's holding in terms of just Mr. Werku's credibility, forgetting about the witnesses. For example, she testified, well, you never told the asylum officers that you distributed leaflets when you were at the asylum office, but now today in immigration court, you're telling me that you distributed leaflets prior to the April 18, 2001 demonstration. The problem is that's completely wrong. At the, Mr. Werku at the asylum office never actually testified that he was distributing leaflets, but in his affidavit that he submitted to the asylum officer, he indicated that he was disseminating information prior to the April 18th demonstration. You know, and I don't mean to cut you off, Mr. Sabobat, it does trouble me somewhat. It looks like this immigration judge was a nitpicker. I mean, a total nitpicker on whether he was, you know, whether he was interrogated three times, was he interrogated two times, four times. In the great picture of things, it really looks like using common sense that it shouldn't matter, but aren't we stuck with a credibility determination? I mean, we can't undo it looking at the record. I mean, I sympathize with you because it just looks like she was picking this apart, but the law doesn't allow us to say that she should have been less of a nitpicker and found him credible, does it? It does not, but the law requires that there's substantial evidence in supporting her credibility determination. Our point is there's not. In terms of the leafleting, whether it's her conclusion that there was not sufficient evidence to support Mr. Werku's political party when we had four witnesses to testify to the party, when we had a letter from the political party, when we had evidence that he was a Romo from the government of Ethiopia. So there was a lot of evidence, and then for her to expect additional evidence is beyond what can be expected. Under a matter of SMJ, unreasonable demands are not placed on him. Where's the evidence, though, that he has a reasonable fear of being persecuted because of his being a Romo and participating in these activities? Besides from his testimony, the four witnesses, three of those witnesses testified that they saw him appearing on television at that demonstration, a political demonstration where he was arrested. They also testified they saw him after the demonstration and personally observed his injuries. This is something that really could have been subject to cross-examination if the judge wanted to reach an adverse credibility finding. And it goes to the totality of the circumstances. The judge was required to look at the totality of the circumstances when evaluating Mr. Werku's credibility. Here, if you have a table with four legs and one of the legs is missing, the table will fall over. That's like this credibility determination. The judge simply ignored the testimony of four live witnesses under an improper legal standard. So to try to support this credibility determination without that is not a proper totality of the circumstances analysis. So, your honors, given that the judge erred as a matter of law in reaching a credibility determination with regard to the four witnesses and treated them as if they were absent as opposed to present witnesses, the credibility determination overall is invalid. And so we would respectfully request that this be reversed. Thank you very much. Thank you. I appreciate it. Ms. Bridey. May it please the court. I'm Surel Bridey for the Attorney General. The crux of this case that respondents admits turns on the standard of review. Judge Keenan's questions went to that issue. That it's not for the court to review the evidence de novo or to reweigh the evidence that the agency considered. The standard is a narrow one. And that is whether substantial evidence supports the adverse credibility decision in this case. There is a presumption of deference given to credibility factual findings in general and credibility findings in specific that the court should apply here. The chronology I'll lay out because it does give some context to the adverse credibility determination. Mr. Work, who applied for asylum in October 2006, some six months after he arrived in the United States, he then was interviewed by an asylum officer in November 2006, some few weeks after filing for asylum. The immigration judge relied, the inconsistencies found were between what he told the asylum officer and what he testified to. And Judge Keenan perhaps finds some of those instances to be nitpicking. But they do, they were specific cogent reasons for the immigration judge's finding. For example, he was specifically asked what happened to him when he arrived at Kaliti prison, the name of the prison outside Addis Ababa. And he testified that he and the others were first asked to crawl over sharp gravel that had the effect of cutting their legs. And in his testimony, he went on saying that when he wasn't able to crawl as fast, they hit him and kicked him. None of that did he present to the asylum officer. In fact, he alleged no specific mistreatment before the asylum officer. So that was one of the main inconsistencies that the immigration judge felt he was confronting. It's really not an inconsistency. He completed the story kind of, perhaps. I mean, it's not inconsistent with what he's hoping for. You're saying the first story is incomplete, maybe. The totality of circumstances includes omissions as well as inconsistencies. But he was asked. It's nitpicking. That's what it is. Well, he was asked specifically what happened to you on the first day when you arrived. And he gave one answer. He didn't crawl over those things. He didn't give that answer until he was testified. Okay. And it goes, the significance of it is it goes to the severity of his mistreatment, if you will. It's one thing simply to be arrested and he said that they took away his shoelaces and others they took their names. That's what he told the asylum officer. That's one thing. But it's another to enhance on that and say that you were subjected to physical abuse at the same time. And we would submit that whether that's an inconsistency or an omission, it was a significant given the immigration judge's perspective who was hearing the record for the first time about events that occurred some thousands of miles away with no other evidence of exactly what happened to him at the time of his arrest. And that is the point that the other witnesses that he called, in addition to the issue, and we submit it's not a legal issue whether or not to give limited weight to their testimony. It is always an abuse of discretion issue. What weight the fact finder gives evidence. We've got to give you a lot of deference. I agree with all that. Credibility determinations. We have to give a lot of deference. But we can still, we've been around a little bit. We can pick out nitpicking when we see it. You can. I would say perhaps that the nitpicking goes to the depth of the review by the immigration judge. Not as to whether or not the immigration judge committed error. And it could be that if the evidence were in equipoise, I think we'd agree the run has to go to the agency because of the standard of review. And that could be what we have here. It's a little troubling, I think, about this case. And maybe you can help me with it. Sure thing. You know, so many of these cases we get where the people are just baldly living illegally in this country for years upon years upon years. And then when they get caught, they say that they are entitled to protections under the Convention Against Torture. Yes. Mr. Warku, he was pretty law-abiding in how he proceeded. Was he not? I mean. He came in on a visa. Yeah, he came in on a visa. And what, a month after it expired, he applied for asylum? So he wasn't one of these people who would hang out and wait until he was caught. He came forward and tried to. He submitted himself to legal process. He didn't wait for the law to find him. Somehow that strikes me as this is an unusual case for that reason. They usually don't come to us that way. Well, it does. Is this true in your experience as well that it's unusual? I would say it's split. It's actually very split between those who are about to have a visa expire and who therefore file an asylum application, as opposed to those who, for example, get arrested and come to the authority's attention that way and then claim for protection under the immigration laws. So I think overall it's fairly split. But I don't think that then prevents the immigration judge from examining the evidence that's put forward. I'm saying it perhaps makes him a little more credible since he followed the legal processes available under our country's law, as opposed to just lying low and hoping he'd never get caught. That is an evaluation. I think it may make him more sympathetic, if you will, in terms of the overall immigration laws. You're saying not more credible? Not more credible, not necessarily. That he still has to be evaluated on the evidence that he put before the immigration judge. Ultimately, the Board of Immigration Appeals upheld the immigration judge's decision. And that's the decision that's before us for review. The board started by noting that its own deference was limited, that it was to apply deference to immigration judge's decisions. And it had been reprimanded, for example, in some of its own cases when it hadn't done that. So it started from that proposition that it was to provide deference to the immigration judge's decision. But it didn't stop there. It found that the immigration judge explained her demeanor findings. She explained and pointed out the inconsistencies that she found. And the board also found that there was an error in giving limited weight to the testimony of the witnesses and their statements. And that is consistent with precedent. We've already discussed the Gonziami case. But there's other precedent in the circuit for that proposition. I refer you to the same case cited, our brief. The judges, if I'm pronouncing that correctly, all of them start from the proposition that there is a problem with evidence coming from persons who have an interested relationship. And that's the crux of the matter. It's the relationship they have with the party who's putting forth the case that can call it into question. And we submit that for that reason, it was not error to give limited weight to the testimony in this case. The immigration judge's first decision in May 2009, she first found that he was 2008, she found that he lacked credibility. And so her 2012 decision incorporated that but made the additional findings that the witnesses he propounded did not absolve him of the credibility problems the immigration judge pointed out. And we think that's for the very simple reason. If he was in fact arrested and mistreated, these witnesses were not there when those activities took place. So they could not overcome those inconsistencies in his own testimony. And they certainly couldn't cure his demeanor findings when he appeared before the immigration judge. Thank you. The immigration judge also gave Mr. Worker an opportunity to explain the inconsistencies. Starting at about page 140 of the administrative record, there's a series of questions where he's asked, did you testify before an asylum officer? Yes. Did you make a statement, for example, that you were, did you tell the asylum officer that your head was slammed against the wall? No, I didn't say that. Did you tell the asylum officer you were interrogated four times instead of two times? No, I didn't say that. I told him I was interrogated twice. He claimed that he was trying to tell the asylum officer only the major things, but that is in and of itself nonsensical, if you will. It's hardly a small thing when your head is slammed against the wall or when you're told to crawl across gravel to cut your legs. It doesn't make sense that if those were the major things, he would have left them out when talking to the asylum officer, but then all of a sudden come up with them during his testimony. Under the Real ID Act, which this court has recognized changed somewhat the review of credibility determinations. The immigration judge has explicitly permitted to consider consistencies, omissions, implausibilities, and demeanor in a witness or an applicant's testimony, and we submit that is what the immigration judge and then ultimately the Board of Immigration Appeals did here, and for those reasons, we submit that there is substantial evidence and that the court should uphold the agency's findings. Hearing no further questions, thank you. Thank you, Ms. Brady. Mr. Duvall. The case was actually before the BIA two times. The first time it was sent back in part because of the judge's failure, immigration judge's failure to consider the witness testimony. When it went back, the judge considered the witness testimony, but it's important to look at what she did. She said, I have a concern with Mr. Worku's testimony about how he got to the demonstration. I don't know how he got from his house to the demonstration. But three of the witnesses say, I saw you at the demonstration. The judge says, well, that doesn't solve my concern about how did he get to the demonstration. That seems to me no reasonable fact finder could say that he wasn't at the demonstration. When you actually look at his testimony, it seems he was a little unsure about what does it mean, how did you get to the demonstration? The question wasn't particularly clearly posed. The question could have been, where were you before the demonstration? How did you get to the demonstration? Instead, it was, how did you come to be at the demonstration? Which indicated to him, it seemed, that what were the events that led up to this demonstration that you attended? For example, Ms. Brady talked about the order of events that took place while Mr. Worku was in detention. None of the witnesses could testify to the order of events because none of the witnesses was present with Mr. Worku while he was in detention. However, all of them testified that he was a political activist, that he was involved in the political party. All of them testified that they observed his injuries, personally observed his injuries after he was released from detention. And then overall, when you look at the asylum office, what happens at the asylum office in this case is Mr. Worku went there pro se. He was not represented by counsel. The interview is conducted by an asylum officer who writes down the notes. Those interviews are under oath. The interview is under oath, Your Honor. But the interview takes place at the behest of the asylum officer who asks the question. The asylum officer doesn't ask you the question. It's not in the notes. And it's a very common scenario where the asylum officer may have a particular concern about a particular area of credibility or whether there's a nexus or whatever. The asylum officer will ask about that particular area but ignore other areas. And when an attorney goes to that interview, he may say to the asylum officer, we never discussed X at this interview. And the asylum officer will say, we don't need to talk about X because I already read about it in your affidavit. So it's true that Mr. Worku didn't discuss all the details of his incarceration and all the injuries that he suffered. He testified that he was providing a bird's eye view. Further, we provided evidence of his PTSD, which could have impacted under Fourth Circuit precedent case law, could have impacted. Are there time constraints on these asylum officers? Not officially, but they're doing at least two interviews a day in the morning. So one at 730, one at 10 a.m. And usually they're in about two hours. So effectively, yes. Are they part-day depositions? Essentially, yes. The applicant goes with or without an attorney, is present in an office. It's supposed to be a non-adversarial relationship or conversation where the officer asks about whatever issues the officer feels are important. In this case, the officer would have presumably read Mr. Worku's affidavit, which was prepared again pro se, and it's not particularly helpful in many ways. He would have read that application. And then he decided, presumably, not to question Mr. Worku in great detail about some of the or about his political activity prior to April 18, 2001, when Mr. Worku attended the demonstration. That was the asylum officer's decision. And the immigration judge should not have then said, well, I see that it's in the affidavit of Mr. Worku when he went to the asylum office, but he never talked about it at the asylum office. That's just not fair. Mr. Worku was not in control. He didn't control that asylum interview. It was controlled by the officer. So essentially, taking into account that he was pro se, taking into account the PTSD, which this court has discussed in a precedent decision from this year, Mr. Worku presented his case at the asylum office, and then he presented a more detailed application once he had counsel at the immigration court, a very much more detailed application in the court that saw the affidavit that he submitted and the affidavit of his witnesses. So there was much that could have been done in terms of cross-examination to examine his credibility. It wasn't done. The judge is nitpicky in terms of looking at ambiguous pieces of testimony from the asylum office and extrapolating from that into something that she deems in conflict with the testimony he provided in court. And if the court looks at the brief that I submitted, I tried to lay out the testimony at the asylum office, the testimony in court, and try to help resolve some of these ambiguities. But the main point here, again, is the legal error, which is four people came to court, four people were prepared to testify and to be cross-examined on Mr. Worku's behalf, four people who knew about his political activity, his persecution, and the government's continued interest in him, and they were dismissed on no legal basis. Now, the immigration judge said that Worku seemed rehearsed and that he was nonresponsive. That's hard to really put into the equation, but somebody seems rehearsed, and that does suggest a little bit of a credibility problem, doesn't it? If I may? Yeah. Demeanor is one factor that can be considered under the real IDF, but by no means is it the only factor. In addition, this court has held in various decisions that when a person has suffered from trauma, and I would point the court to here, I didn't mention it in the brief, actually it came out after the brief was written, and I didn't find it until I was preparing for oral argument, but Ilunga v. Holder, 777 F. 3rd 199, on page 213, the totality of the circumstances analysis should take into account the inherent instability of memories that are naturally misshapen by time and disfigured by trauma. So demeanor is a factor, but when a person is testifying in a different language, when it's being transmitted through an interpreter, when the person was pro se originally, and when the person has suffered a trauma, that has to be taken into consideration as well. Thank you. Thank you very much.
judges: Robert B. King, Barbara Milano Keenan, Henry F. Floyd